UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

SUSAN DAY, M.D.,

      Plaintiff,

v.                                      Case No. 18-CV-58

                                            Hon.

SPECTRUM HEALTH MEDICAL GROUP,

      Defendant.

_____

# COMPLAINT AND DEMAND FOR JURY TRIAL

_____

## COMPLAINT

### INTRODUCTION

Plaintiff Susan Day, M.D., hereby files this Complaint and states as follows:

### JURISDICTION AND VENUE

1.     This is an action requesting that the Court remedy violations of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e, et seq.; the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621 et seq.; the Americans With Disabilities Act, 42 U.S.C. § 12101 et. seq.; and factually-related violations of Michigan's Elliott-Larsen Civil Rights Act ("ELCRA"), Mich. Comp. Laws § 37.2101, et seq.

2.      Plaintiff Dr. Susan Day is an orthopedic surgeon and resident of Kent County, Michigan, located in the Western District of Michigan.  Dr. Day was employed by Defendant Spectrum Health Medical Group ("SHMG") until SHMG constructively terminated her employment on or about January 1, 2018.

3.      Defendant SHMG is a Michigan non-profit corporation headquartered in Grand Rapids, Michigan, and provides physician and other medical provider services, via its approximately 1,400 providers, to individual patients throughout Western Michigan at a number of facilities and in multiple practice specialties. Defendant is an employer within the meaning and coverage of the statutes cited in prior paragraphs.

4.      Plaintiff and Defendant entered into an employment agreement on or about May 12, 2010.  There is an arbitration clause in the agreement which is unenforceable.  SHMG has failed to respond to an offer by Dr. Day to amend the written terms of the arbitration clause and arbitrate this dispute. Therefore, Dr. Day files this action in this Court to request relief to which she is due under federal and state law.

5.      Spectrum Health Hospitals ("SHH") is a Michigan non-profit corporation headquartered in Grand Rapids, Michigan, and provides comprehensive health care services to individual patients at a number of hospital and surgical facilities throughout Western Michigan.

6.      SHMG and SHH are part of Spectrum Health System, commonly known as Spectrum Health, which is an integrated, managed care health care

conglomerate based in Western Michigan. Spectrum Health's subsidiaries include hospitals, treatment facilities, urgent care facilities, a subsidiary health plan, as well as physician practices that operate in Western Michigan.  It is the largest employer in West Michigan with 25,400 staff, 3,200 physicians and advanced practice providers, including the 1,400 employees of the SHMG.

## COUNT I - VIOLATION OF TITLE VII – SEX DISCRIMINATION
## FACTUAL ALLEGATIONS

7.      Dr. Day is a 53-year-old, female board-certified orthopedic surgeon and has worked in Grand Rapids since completing both her internship and residency with SHH's predecessor entity, Blodgett Memorial Medical Center, in 1997.  Since that time, Dr. Day has been employed by SHMG or its predecessor entities, and she has had medical staff privileges at SHH or its predecessor entities.  Dr. Day has also taught as a clinical instructor at Michigan State University's College of Human Medicine and Grand Valley State University.

8.      Dr. Day is a widow and supports her two minor children.

9.      Dr. Day was employed by SHMG's orthopedics practice, known as either SHMG's Orthopedics Department or as its Department of Musculoskeletal Sciences ("the Orthopedics Department" or "the Department"), which is located at 4100 Lake Drive SE, Suite 300, Grand Rapids, Michigan.  Dr. Day was also section chief for the Department's Adult Reconstruction Section.  Dr. Day was one of the busiest providers in SHMG's Orthopedics Department, with one of its highest patient-satisfaction scores, until she went on a medical leave for the treatment of breast cancer in October 2016.

10.     Dr. Day has also enjoyed a good record of results in her surgical cases throughout her career.

11.     Because Dr. Day has practiced in Western Michigan for her entire career, she has an extensive word-of-mouth referral network and patient base.

12.     SHMG hired Dr. Peter Jebson to become the Department's Chief and lead the Department, first on an interim basis and then on a permanent basis, around November 2015.

13.     Dr. Jebson did not handle criticism or opposition well regarding administrative or business practices of the Orthopedics Department from any of his surgical partners, but he particularly did not like ideas, criticism or respectful opposition from Dr. Day, who was the lone female surgeon in the Department.

14.     Around June 2016, Dr. Day raised administrative concerns about the use of Physician Assistants ("PAs") within the Department.  At this point, however, her concerns were mostly of a business nature, i.e., whether the Department was being cost-effective and was respecting the PAs as independent medical professionals and giving them fulfilling and appropriate work.

15.     Around August 2016, Dr. Day began to inquire further about allocation of PA resources within the Department with Jason Raehl, one of the PAs who was an administrator for the PA program.  Another of her concerns was that PAs were not being assigned to the various surgeons in the practice in a fair, efficient, or cost-effective manner.

16.     However, in looking at this issue, Dr. Day also discovered a potential billing compliance problem involving some of her colleagues' use of their PAs. After doing some independent research on Medicare's rules for billing, Dr. Day believed she discovered a serious violation of those rules with respect to SHMG's billing of some patient visits happening within the Orthopedics Department among some of her colleagues, including Dr. Jebson.

17.     Dr. Day then immediately raised this compliance concern with the SHMG's Orthopedics Department office manager, Kristina Grzybowski, regarding the way that SHMG was billing for certain physician and PA visits.  After raising the issue with Ms. Grzybowski in person, Dr. Day also sent her a text message regarding the concern, including a link to an article about the billing practice at issue. Ms. Gryzbowski responded that she would report it to Maureen "Mo" Miller, director of operations for the SHMG Orthopedics Department.

18.     After discovering what was happening, Dr. Day told Ms. Grzybowski in her text message: "Please pay attention to the compliance piece of this.  This needs to be addressed now.  It's not optional."

19.     Two days after sending that text, Dr. Day's personal physician diagnosed her with breast cancer, and she immediately left her medical practice on a leave of absence to receive treatment.  Dr. Day underwent multiple surgeries for eventual mastectomy of both breasts and then chemotherapy over the next several months.

20.     While Dr. Day was recuperating on her medical leave, Dr. Jebson turned over Dr. Day's patient practice to three other surgeons in the Department, including Dr. Charles "Chris" Sherry, to cover while Dr. Day was out. Dr. Sherry was a younger surgeon who did not have a full practice load on his own keeping him busy.

21.     Shortly after Dr. Day began her medical leave, Dr. Jebson took a patient file of Dr. Day's to another physician in the Orthopedics Department and the chair of the internal Department peer review committee, Dr. Kevin Anderson. Dr. Jebson asked Dr. Anderson to personally review the file and report back whether Dr. Anderson believed Dr. Day had performed incompetently with respect to the total hip replacement that she performed on the patient.  Dr. Anderson reviewed the file and told Dr. Jebson that he had no problem with how Dr. Day handled the patient's care.

22.     Dr. Jebson then directed Dr. Anderson to have the entire six-doctor internal peer review committee within the Department look at the hip replacement file, which Dr. Anderson did.  That committee also found that Dr. Day performed competently with respect to her patient.

23.     On November 8, 2016, Drs. Jebson and Sherry met with and pressured other doctors in Adult Reconstruction Section to look for additional files of Dr. Day to be reviewed.  Specifically, Drs. Jebson and Sherry were seeking patient files of Dr. Day where there was an unexpected outcome or complication, or where there was a disagreement between surgeons about whether there were indications to

perform surgery. Upon information and belief, Drs. Jebson and Sherry were looking for files with an unexpected outcome or complication to assert that Dr. Day did something wrong or performed incompetently, even though all surgeons, regardless of skill, have some number of unexpected outcomes or complications. Upon information and belief, Drs. Jebson and Sherry were looking for files where there were potential disagreements between surgeons about whether there were indications to operate, even though such differences of opinion between surgeons regarding whether to operate and with what treatment plan in a field of elective surgery like orthopedics is quite common.

24. When another physician in the Section, Dr. Hassan Alosh, did not send them any files of Dr. Day's, the office staff repeatedly contacted Dr. Alosh, telling him that he must send in files. Dr. Alosh then told them that he did not have any such files, and furthermore did not feel it was right to target Dr. Day when she was on medical leave and could not defend herself. Specifically, Dr. Alosh meant that Dr. Day would be unable to offer her opinions or explain her position on the medical facts in the file to other orthopedic experts because she was enduring breast cancer treatment and on a leave of absence without access to her files, even if she were well enough to participate in a review.

25. Dr. Jebson and/or Dr. Sherry then went to Dr. Alosh's PA, Matthew Kenny, and told him to turn in files from Dr. Day's patients for review. Under pressure to do so, Mr. Kenny sent them four files of Dr. Day's patients, even though Dr. Alosh had no concerns with those files.

26.     Drs. Jebson and Sherry then put together approximately 16 files of Dr. Day's patients to send to SHH's Medical Staff Executive Committee ("MEC") for external review – instead of the standard procedure of going to the Orthopedics Department's internal peer review committee if they had legitimate concerns about a colleague's competency.  As to these files, Drs. Jebson and Sherry claimed there was inadequate indication for Dr. Day to treat the patients surgically, but that Dr. Day had performed surgery on those patients anyway.  Drs. Jebson and Sherry specifically targeted Dr. Day for this non-random review, in a manner which was unprecedented and to which no other Department surgeon had been subjected.

27.     Neither SHH nor SHMG notified Dr. Day that its Orthopedics Department was targeting her files in this manner while she was out receiving breast cancer treatment, nor did it ask her to provide information or give her an opportunity to defend herself on those files until months later when she provided notice of her date of return to work.  During her leave, SHH and SHMG cut off Dr. Day's access to her medical files.  Once she was notified of the pending investigations, SHH and SHMG instructed Dr. Day that she was not permitted to even speak with any of her colleagues or any staff in the Orthopedics Department.

28.     The MEC sent the files of Dr. Day which were collected in the Orthopedics Department to an external reviewer.  Those files spanned several years. Although they were presented as "surgical indications" files where she allegedly performed surgery even though surgery was not appropriate, some of them were cases on which Dr. Day did not ultimately recommend surgery and did

not, in fact, operate on the patients.  Regardless, Dr. Day appropriately treated all of the patients in the files sent for review, and performed competently as to all patients, including the ones where surgical procedures were performed.

29.    The Orthopedics Department's act of sending Dr. Day's files directly to the MEC, without going through the Department's internal peer review system, was unprecedented.  It was contrary to normal practice and procedure, and significantly exceeded the peer review of files by other male orthopedic surgeons where one of their patients had a complaint or unusual complication or adverse result – none of which was present in any of Dr. Day's patient files that Drs. Jebson and Sherry escalated to the level of MEC review.

30.    On March 22, 2017, because Dr. Day's physician cleared her to return to work, Dr. Day asked to end her medical leave and resume medical staff privileges at SHH as of April 16, 2017.

31.    SHMG then notified Dr. Day that it was suspending her employment with pay pending an investigation into her treatment of her patients.  In a meeting on April 17, 2017, Nicole McConnell, Senior Vice President, Human Resources for Spectrum Health System, and Dr. Douglas Apple, Chief Medical Officer for SHMG, informed Dr. Day that she was being suspended with pay from SHMG.  Among other concerns that Dr. Day raised in that meeting detailing why her suspension was patently unfair and discriminatory, she advised Ms. McConnell and Dr. Apple about the "shared visit" billing compliance violation that she raised in October 2016 with the Orthopedics Department's administration.

32.     Upon information and belief, SHMG's Orthopedics Department notified providers on April 27, 2017 that it would be implementing new procedures, effective May 8, 2017, which appear to be designed or intended to comply with the "shared visit" rules that Dr. Day brought to the attention of Dr. Apple and Ms. McConnell on April 17, 2017.

33.     Sometime in late April 2017, SHH notified Dr. Day that it had summarily suspended her medical privileges pending further action of its MEC, so its MEC could consider whether to suspend or terminate her privileges on a permanent basis because of the charge that she had operated on patients where it was not medically necessary or advisable to do so.  This charge was false and malicious.

34.     Upon information and belief, Dr. Jebson was an instigating force behind SHH's unwarranted investigation and suspension of her hospital privileges, and he did so in bad faith and motivated by unlawful discrimination and retaliation.

35.     Upon information and belief, Dr. Jebson was an instigating force behind SHMG's unwarranted investigation and suspension of Dr. Day's employment, and Dr. Jebson did so in bad faith and motivated by unlawful discrimination and retaliation.

36.     Members of the MEC Leadership Committee told Dr. Day that they waited so long between first receiving her patient files in November 2016 and taking action to potentially suspend her SHH privileges because they had been given information that she might not return to her medical practice.  Dr. Day never

10

gave anyone this impression nor told anyone that she might not return to practice medicine after her breast cancer treatment.

37.    None of Dr. Day's surgeon colleagues in the Orthopedics Department leadership contacted her whatsoever during her medical leave to receive breast cancer treatment, and so none of them had any discussion with her about her treatment, recovery, wellbeing or prognosis.

38.    The MEC provided Dr. Day a few days of notice with the files it had sent to an external reviewer before holding an initial meeting to discuss whether to go to a hearing to suspend and/or terminate her medical staff privileges.  SHH and SMHG provided a few days of access to Dr. Day with their respective medical records systems to permit her to review the records of these patients, some of whose files dated back five years or more, since both SHH and SMHG had cut off her access to the medical records while Dr. Day was on medical leave.

39.    The MEC Leadership Committee first met with Dr. Day two weeks after initially giving her the list of the first 16 cases, but permitted her only to review four of them at that time. After eventually being given all 16 cases, the MEC gave Dr. Day 20 minutes to speak to the MEC at the initial meeting and discuss in broad terms, not patient file-by-patient file, why her treatment was appropriate and justified.  Dr. Day did so.  Prior to attending the meeting, the MEC proposed that in exchange for restoring her medical staff privileges, Dr. Day agree to a Focused Professional Practice Evaluation ("FPPE").  The MEC proposed that under the FPPE, and once she returned to work, Dr. Day would have another surgeon of her

choosing review her first 50 surgical cases with her before she operated.

40.     SHH leadership told Dr. Day that imposing an FPPE is a typical step taken when a surgeon returns after an extended medical leave, and that an FPPE should not be viewed as a "punitive" measure.  Physicians associated with SHMG and SHH leadership told her that insisting on a full hearing and fighting a potential suspension or termination of medical staff privileges with SHH would be expensive and risky to her career.  At the time, Dr. Day, a widow with two children, had just finished chemotherapy and was concerned about getting back to work, and being sure she did not run the risk of losing her family's health insurance.  Because of all of those factors, Dr. Day agreed to the 50-case FPPE on May 9, 2017, at which point her privileges to perform surgery at SHH were restored.

41.     However, after Dr. Day agreed to the 50-case FPPE, SHMG then continued Dr. Day on suspension from employment while it said it was continuing to investigate her medical decision making.

42.     On May 5, 2017, Dr. Day learned that SHH and SHMG repaid insurers for six surgeries that she performed, because SHH allegedly determined that those surgeries were not "medically necessary."  Neither SHH nor SHMG notified Dr. Day nor sought to interview her before making repayment on these procedures.  Upon information and belief, although SHH and/or SHMG has previously repaid insurers for surgeries within the Orthopedics Department before, because of inadequate documentation in the electronic medical record to demonstrate "medical necessity," SHH and/or SHMG notified surgeons of its concerns first and interviewed them to

12

determine if there was additional information which should considered before coming to a final determination to repay.

43.     Indeed, inadequate documentation in patient medical records to demonstrate "medical necessity" was considered a widespread problem among all of Dr. Day's surgeon colleagues in the Orthopedic Department.  Prior to Dr. Day's medical leave, SHH and SHMG hired a registered nurse to review all patient medical records once surgery was scheduled in the Orthopedics Department, to be sure that adequate documentation of medical necessity for surgery was found in the file.  The nurse then sends files back to surgeons when necessary to better document all factors leading to the decision to operate.  All surgeons in the Department went through additional training about this increased focus on adequate file documentation prior to Dr. Day's medical leave.  Moreover, insurers would have required some prior authorization for all of these surgeries, meaning that some agent of the insurers had conducted a file review before surgery to check for appropriate indications to operate and had agreed that surgery was justified.

44.     SHMG and SHH refused to provide Dr. Day with any information about these repayment cases until August 14, 2017, despite SHMG's frequent citation of this issue as part of the reason Dr. Day was suspended while being investigated.

45.     Once SHMG released information to Dr. Day regarding the cases that SHMG and SHH repaid to insurers, Dr. Day was able to determine that all were performed in the time period before implementation of the heightened

documentation procedure and Department policy changes.  However, the cases for which SMMG and SHH reimbursed insurers involved surgeries which were justified by medical necessity.  Dr. Day could have provided additional facts to support the decision to operate if she had been asked.

46.     Upon information and belief, most or all of Dr. Day's colleagues would have just as many, if not more, cases as she did which contain similar inadequate documentation in the patient records demonstrating medical necessity to operate.

47.     Upon information and belief, neither SHH nor SHMG reviewed cases of Dr. Day's colleagues when it reviewed hers to look for inadequate documentation and make repayment to insurers.

48.     When the Orthopedics Department has reviewed patient cases of Dr. Day's colleagues in the past, it has not skipped the internal peer review procedure in the extreme manner that it did with respect to her.  This has been true even when patient complaints or serious complications were the prompt to send cases to peer review, and neither of those elevated concerns precipitated this unprecedented review of Dr. Day's work.  In addition, SHMG has not suspended Dr. Day's colleagues from practice while allegedly using the peer review procedure to improve quality, even when peer review was prompted by patient complaints or serious complications.  In this instance, SHMG used a sham peer review procedure to further the agenda of Dr. Jebson and one or two other surgeons, who stood to financially benefit from Dr. Day's absence, in order to unlawfully push Dr. Day out of practice at SHMG and at SHH.  The Orthopedics Department pays its doctors, or

14

paid them during the relevant time period, on a production basis, meaning that other doctors in the Department stood to financially benefit if Dr. Day's patients were distributed to them because of her absence.

49.    At the time of her suspension, Dr. Day was the lone female surgeon in the department and, then aged 52, one of the department's older and most experienced orthopedic surgeons with the largest patient base and word-of-mouth referral network.

50.    SHMG's actions have unfairly damaged, and will continue to unfairly damage, Dr. Day's established patient base, referrals, and practice goodwill.  Upon information and belief, Dr. Jebson's actions, and the actions of some of the other physicians directed by him in the Orthopedics Department, have been designed to unlawfully, unfairly, and irreparably damage Dr. Day's standing in the practice and retaliate against her for raising the billing compliance violation, in addition to being the result of other types of unlawful discrimination and retaliation on the basis of Dr. Day's sex, age, and/or her actual and/or perceived disability as a breast cancer survivor.

51.    Dr. Day presented SHMG and SHH with her claims that her suspension and referral to sham peer review outside the normal internal peer review committee were the result of unlawful discrimination on the basis of her sex, her age, and/or her actual and/or perceived disability as a breast cancer survivor. Dr. Day also advised SHMG that her treatment constituted unlawful retaliation under the federal False Claims Act for complaining that the "shared visit" billing

15

practice used in the Orthopedics Department by some of her partners presented a billing compliance problem.

52.     During the investigation that SHMG conducted while continuing Dr. Day on suspension for three months, SHMG's investigation report noted that Dr. Day was well-liked by patients, and was a very productive surgeon.  The report noted that another surgeon told the investigating SHMG management personnel that Dr. Jebson's investigation was "mean-spirited and politically motivated."  He also said that Dr. Day's performance was comparable to others in the Department. Another colleague also said he had no concerns with Dr. Day's technical ability, and that she was a "caring physician who is well-liked by [her] patients." Both PAs who worked extensively with Dr. Day also reported that she was an excellent surgeon well-liked by patients, and denied observing Dr. Day performing unnecessary surgeries.

53.     Upon information and belief, employees of the Orthopedics Department also reported to SHMG that Dr. Jebson had made racist and ethnically-discriminatory statements and that they believed Dr. Jebson's treatment of Dr. Day was motivated by sexism, but those reports did not end up as part of the SHMG investigation shared with Dr. Day.

54.     As part of the SHMG investigation, it sent the 20 cases handpicked by Drs. Jebson and Sherry (including the four that Dr. Alosh's PA provided after significant pressure by Drs. Jebson and Sherry) to an anonymous external reviewer. SHMG provided short summary comments from the reviewer on each case to Dr.

Day.

55.     Of the 20 cases that SHMG had reviewed as part of its investigation, **none of the procedures that Dr. Day performed were cited in the summary provided to Dr. Day as being performed without appropriate indications to perform surgery**. However, an external reviewer cited three subsequent revision surgeries that **Dr. Sherry performed on Dr. Day's patients while she was out on medical leave as being unnecessary or failing to show appropriate surgical indications**.  Upon information and belief, SHMG has not begun a review of Dr. Sherry's work as a result of this external review, nor has it suspended Dr. Sherry from practice during any such investigation.

56.     Of the 20 cases that SHMG had reviewed as part of its investigation, the external reviewer said that Dr. Day failed to "meet the standard of care" in six of the cases, based on varus alignment of resulting replaced joints after surgery. **** This was an erroneous finding, and Dr. Day's work met the "standard of care" in those cases and all of her cases.  In her response to SHMG on this 20-case review, Dr. Day provided significant medical literature citing the lack of precise measurement provided by SHMG to determine the exact alignment, making the determination of the actual degree of varus alignment impossible.  In addition, Dr. Day's rebuttal cited medical literature noting justifiable explanation for the alignment as it could be determined by the insufficiently precise measurement provided by SHMG.  For example, one case involved a patient with another medical condition which makes perfect joint alignment impossible, but that medical history

17

was not noted by the reviewer, and it is unknown if the reviewer had sufficient medical records from SHMG to be apprised of that fact.

57.     Nonetheless, SHMG presented a recommendation to terminate Dr. Day's employment at its Professional Standards Committee at a hearing on July 26, 2017.  The Professional Standards Committee is a committee of physicians of various medical specialties. Dr. Day was permitted to provide the PSC with written materials challenging the unnamed expert's summary findings on her medical and surgical skill.

58.     Dr. Day also submitted a letter from her attorney for the PSC's consideration further describing her legal position and her complaints of unlawful discrimination and explaining her position about the motivation of the sham peer review, but SHMG refused to provide that to the PSC.

59.     After the PSC's hearing, the PSC agreed that Dr. Day was entitled to return to work.  In this hearing, Dr. Day was permitted to address the PSC, but she was not permitted to have her attorney there on her behalf.

60.     SHMG then conditioned Dr. Day's return to work upon her signing a so-called "Last Chance Agreement."

61.     On July 31, 2017, SHMG presented Dr. Day with a draft so-called "Last Chance Agreement" which required her to waive any rights she had to a pre-termination hearing in the event of a future employment dispute with SHMG, required her to waive any claim of past illegal treatment, and contained other untenable and unwarranted terms. Despite wanting to return to her work as an

orthopedic surgeon, Dr. Day refused to enter into such an Agreement for a number of reasons, not least of which because it would continue to leave her vulnerable to illegal treatment in the Orthopedics Department.

62.     SHMG then presented a second, slightly revised "Last Chance Agreement" that it told Dr. Day it would require her to sign, without further negotiation, if she wished to return to practice without further hearings.  The terms of this "Last Chance Agreement" were also unacceptable, and Dr. Day declined to sign it.  Among other issues, the second "Last Chance Agreement" required Dr. Day to agree that her care put patients at risk, which it did not, and which she refused to say in order to be returned to work.  After Dr. Day refused to sign a "Last Chance Agreement" as a condition to being permitted to return to work, SHMG put Dr. Day on unpaid suspension as of August 21, 2017.

63.     SHMG then scheduled a meeting of its Board of Directors for September 29, 2017 to determine whether to terminate Dr. Day's employment.

64.     On September 26, 2017, three days before the SHMG Board meeting to consider Dr. Day's termination, SHMG initiated settlement discussions with Dr. Day to induce her resignation.  SHMG and Dr. Day exchanged various settlement proposals, but ultimately failed to come to terms and did not reach an agreement.

65.     On or about September 29, 2017, SHH and/or SHMG filed a report with the National Practitioner Database ("NPDB"), alleging that it had received complaints that Dr. Day was operating on patients without appropriate indications of need for surgery and reporting that Dr. Day agreed to a 50-case FPPE with her

SHH privileges.

66.   On May 10, 2017, Cynthia Smeenge, SHH's Medical Staff Office Director, told Dr. Day that she would receive notice of any allegation reported to NPDB, if one was reported, and that SHH would give Dr. Day the opportunity to respond to the allegation as part of any report submitted to NPDB.

67.   SHH made the report of its allegations to NPDB without notifying her that it had done so, and without permitting her response to the allegations to be included as part of the submitted.

68.   SHH's report to NPDB was made more than nine months after it began its review of Dr. Day's cases outside the normal peer review process, and more than five months after she agreed to the proposed FPPE.

69.   SHH's report to NPDB was made immediately, i.e., within three days, after she refused a proposal to surrender her SHH hospital privileges as part of settlement negotiations with SHMG, and made it clear that she would not surrender her SHH privileges without significant compensation.

70.   SHH and/or SHMG knew, or should have known, that NPDB would likely forward a report like the one SHH and/or SHMG made regarding Dr. Day to Michigan's State Medical Board for an investigation into whether sanctions should issue against Dr. Day's medical license.

71.   On or about October 10, 2017, NPDB indeed forwarded the report to Michigan's State Medical Board for investigation.

72.     In December 2017, an investigator with Michigan's Department of Licensing and Regulatory Affairs ("LARA") contacted Dr. Day to notify her that a complaint was made against her and that LARA would conduct an investigation on behalf of the State Medical Board.

73.     In December 2017, the LARA investigator contacted SHH and asked to be contacted for more information about its complaint, which did not mention specific cases or provide any detail.

74.     Instead of responding to LARA, SHH caused its third-party administrator to engage an attorney to represent Dr. Day in the LARA investigation, as is its usual practice whenever one of its doctors is investigated by LARA.  Dr. Day and her counsel spoke with the attorney that SHH hired, Mark Fatum, and expressed concerns about his potential conflict of interest and whether he would be able to provide independent counsel to Dr. Day in the LARA investigation.  Dr. Day's counsel requested to participate in the investigation process to protect Dr. Day's interests as against SHH and SHMG.  Dr. Day's counsel also declined to acquiesce to SHH's requirement that Mr. Fatum inform SHH of the details of his representation of Dr. Day in the LARA investigation.  As a result, SHH instructed its third-party administrator to decline to provide counsel to Dr. Day in the LARA investigation and to ask Mr. Fatum to withdraw from his representation of Dr. Day, which he did.

75.     As a result, Dr. Day was required to provide her own independent counsel in the LARA investigation at her own expense.

76.     Although the parties ultimately did not come to agreement on the key terms of a settlement agreement, SHMG has taken the position that the parties have a binding settlement agreement.  SHMG has reported through its counsel that it considers Dr. Day to have resigned as part of this purported settlement agreement as of October 2, 2017.  Dr. Day disputes both the assertion that the parties have a binding settlement agreement and that she resigned as of October 2, 2017.  However, SHMG has not returned Dr. Day to work, is not paying her, and has at least constructively terminated her employment.

77.     SHMG's actions constitute discrimination on the basis of sex, as Dr. Day has exhibited better or similar surgical skill and decision making as her male colleagues in the Orthopedics Department.  However, no male orthopedic surgeon has been subject to sham peer review, suspension during an "investigation" of his cases and assertions of unlawful treatment, eventual loss of pay when that suspension was converted to an unpaid leave, and/or other similar, punitive measures to which Dr. Day has been subjected.

## CAUSE OF ACTION

78.     SHMG violated 42 U.S.C. § 2000e–2 when it terminated Dr. Day's employment as aforesaid.

79.     Dr. Day has suffered irreparable harm, in that she has been unlawfully terminated as aforesaid, and will continue to suffer such harm unless

the relief requested herein is granted.

## STATUTORY PREREQUISITES

80.     On or about October 26, 2017, pursuant to 42 U.S.C. § 2000e–5(e), Dr. Day filed a charge of discrimination with the Equal Employment Opportunity Commission (EEOC).

81.     EEOC advised Plaintiff by letter dated November 21, 2017, a copy of which is attached hereto as Exhibit 1, that she was entitled to institute a civil action within 90 days of receipt of said letter, in accordance with 42 U.S.C. § 2000e–5(f)(1).  Dr. Day received said letter on or about November 27, 2017.

## RELIEF SOUGHT

WHEREFORE, Dr. Day requests that the Court grant the following relief:

A.     Restore Dr. Day to her employment position;

B.     Award Dr. Day damages equal to any salary, wages, bonuses, employment benefits and/or other compensation denied or lost to her by reason of violations of Title VII by SHMG, plus interest;

C.     Award Dr. Day compensatory damages for mental anguish, emotional distress, and damage to her patient base;

D.     Award Dr. Day punitive damages;

E.     Award Dr. Day her costs and reasonable attorney fees;

F.     Award Dr. Day such other relief as may be just and equitable.

## COUNT II - VIOLATION OF AGE DISCRIMINATION IN EMPLOYMENT ACT OF 1967 – FACTUAL ALLEGATIONS

82.     Dr. Day relies on the allegations of all prior paragraphs, as if they were restated herein.

83.     SHMG's actions constitute discrimination on the basis of age, as Dr. Day has exhibited better or similar surgical skill and decision making as her younger colleagues in the Orthopedics Department.  However, no younger orthopedic surgeon has been subject to sham peer review, suspension during an "investigation" of his cases and assertions of unlawful treatment, eventual loss of pay when that suspension was converted to an unpaid leave, and/or other similar, punitive measures to which Dr. Day has been subjected.

84.     SHMG's actions appear to be motivated, at least in part, by a desire to financially benefit younger surgeons like Dr. Sherry who had smaller patient bases before assuming control of portions of Dr. Day's practice.

85.     SHMG's actions constitute unlawful discrimination on the basis of Dr. Day's age.

## CAUSE OF ACTION

86.     SHMG violated 29 U.S.C. § 621 et seq. when it discharged Dr. Day as aforesaid.

87.     Dr. Day has suffered irreparable harm, in that she has been unlawfully terminated as aforesaid, and will continue to suffer such harm unless

the relief requested herein is granted.

88.     All statutory prerequisites for this claim have been met as alleged in preceding paragraphs.

## RELIEF SOUGHT

WHEREFORE, Dr. Day requests that the Court grant the following relief:

A.     Restore Dr. Day to her position;

B.     Award Dr. Day damages equal to any salary, wages, bonuses, employment benefits and/or other compensation denied or lost to her by reason of violations of ADEA by SHMG, plus interest;

C.     Award Dr. Day compensatory damages for mental anguish, emotional distress, and damage to her patient base;

D.     Award Dr. Day punitive damages;

E.     Award Dr. Day her costs and reasonable attorney fees;

F.     Award Dr. Day such other relief as may be just and equitable.

## COUNT III - VIOLATION OF AMERICANS WITH DISABILITIES ACT – FACTUAL ALLEGATIONS

89.     Dr. Day incorporates by reference all prior Paragraphs of this Complaint.

90.     SHMG's actions constitute discrimination on the basis of the disability and/or the perceived disability of having had breast cancer and the resulting medical treatment for her cancer.  Dr. Day has exhibited better or similar surgical skill and decision making as her male colleagues in the Orthopedics Department who have not suffered with similar medical conditions and had to take medical leaves of absence.  No other orthopedic surgeon has been subject to sham peer review, suspension during an "investigation" of his cases and assertions of unlawful treatment, eventual loss of pay when that suspension was converted to an unpaid leave, and/or other similar, punitive measures to which Dr. Day has been subjected.

91.     Upon information and belief, SHMG's agents provided information to SHH and within the Orthopedics Department that Dr. Day would never return to her surgical practice after her breast cancer treatment, even though neither she nor anyone else gave SHMG any reason to believe that her condition would prevent her eventual recovery and return to work.  SHMG's provision of this inaccurate information was the result of either an inaccurate perception about Dr. Day's breast cancer disability, which unlawfully influenced its treatment of her, and/or was designed to begin a process of winding down her practice without her consent, by attempting to permanently steer patients who wished to treat with Dr. Day to other providers.

92.     SHMG's actions constitute unlawful discrimination on the basis of a disability of Dr. Day and/or because of a perceived disability.

26

## CAUSE OF ACTION

93.     SHMG violated 42 U.S.C. § 12101 et. seq. when it discharged Dr. Day as aforesaid.

94.     Dr. Day has suffered irreparable harm, in that she has been unlawfully terminated as aforesaid, and will continue to suffer such harm unless the relief requested herein is granted.

95.     All statutory prerequisites for this claim have been met as alleged in preceding paragraphs.

## RELIEF SOUGHT

WHEREFORE, Dr. Day requests that the Court grant her the following relief:

A.     Restore Dr. Day to her position;

B.     Award Dr. Day damages equal to any salary, wages, bonuses, employment benefits and/or other compensation denied or lost to her by reason of violations of ADA by SHMG, plus interest;

C.     Award Dr. Day compensatory damages for mental anguish, emotional distress, and damage to her patient base;

D.     Award Dr. Day punitive damages;

E.     Award Dr. Day her costs and reasonable attorney fees;

F.     Award Dr. Day such other relief as may be just and equitable.

## COUNT IV –RETALIATION IN VIOLATION OF THE ELLIOTT-LARSEN CIVIL RIGHTS ACT

96.    Dr. Day incorporates by reference all prior Paragraphs of this Complaint.

97.    On or about September 29, 2017, SHMG either made and/or caused SHH to file a report with the National Practitioner Database ("NPDB"), alleging that it had received complaints that Dr. Day was operating on patients without appropriate indications of need for surgery and reporting that Dr. Day agreed to a 50-case FPPE with her SHH privileges.

98.    Dr. Day was denied the opportunity to respond to the report to NPDB, as she was entitled to do and as Ms. Smeenge informed Dr. Day she would be given the opportunity to do.

99.    The report of allegations to NPDB without a response from Dr. Day or further information ensured that Dr. Day would be subject to a LARA investigation, which she has been.

100.    The report to NPDB was made more than nine months after SHH and SHMG began review of Dr. Day's cases outside the normal peer review process, and more than five months after she agreed to the proposed FPPE.

101.    The report to NPDB was made immediately, i.e., within three days, after Dr. Day refused a proposal to surrender her hospital privileges as part of settlement negotiations with SHMG, and made it clear that she would not surrender her SHH privileges without significant compensation.

102.    SHMG and SHH knew, or should have known, that NPDB would likely forward a report like the one SHMG and/or SHH made regarding Dr. Day to Michigan's State Medical Board for an investigation into whether sanctions should issue against Dr. Day's medical license.

103.    SHMG made, and/or caused SHH to make, the report to NPDB in bad faith and not for any protected or legitimate purpose, but instead in retaliation for her discrimination claims, in violation of Mich. Comp. Laws § 37.2701.

104.    The report to NPDB that Dr. Day operated without appropriate surgical indications was made in bad faith for the purpose of harming Dr. Day's reputation and surgical career, and to increase the likelihood of state action or settlement with the State Medical Board impairing her medical license, which would have the end result of endangering her hospital privileges or facilitating SHH's unwarranted opportunity to take negative action in bad faith as to Dr. Day's hospital privileges.  SHMG made a report to NPDB or caused the report to occur in retaliation for Dr. Day's assertion of violations of rights under federal and state anti-discrimination laws, and not for any proper purpose.

105.    SHMG has caused damages to Dr. Day as a result of this violation of Mich. Comp. Laws § 37.2701, including but not limited to mental and emotional anguish, her lost work time spent responding to the LARA investigation, and attorney fees.

## RELIEF SOUGHT

WHEREFORE, Dr. Day requests that the Arbitrator grant her the following relief:

A.      Restore Dr. Day to her position;

B.      Award Dr. Day damages equal to any salary, wages, bonuses, employment benefits and/or other compensation denied or lost to her by reason of these actions by SHMG, plus interest;

C.      Award Dr. Day compensatory damages for mental anguish, emotional distress, and any loss to her patient base;

D.      Award Dr. Day punitive damages;

E.      Award Dr. Day her costs and attorney fees;

F.      Award Dr. Day such other relief as may be just and equitable.


PINSKY, SMITH, FAYETTE & KENNEDY, LLP
Attorneys for Plaintiff Susan Day, M.D.

Dated: January 16, 2018        By: /s/ Sarah R. Howard
                               Sarah Riley Howard
                               Business Address:
                               146 Monroe Center, N.W., Suite 805
                               Grand Rapids, MI 49503
                               (616) 451-8496
                               showard@psfklaw.com

30

## JURY DEMAND

To the extent jury trial is allowed with regard to any of the issues as set forth above, Plaintiff Susan Day demands the same.

PINSKY, SMITH, FAYETTE & KENNEDY, LLP
Attorneys for Plaintiff Susan Day, M.D.

Dated: January 16, 2018            By: /s/ Sarah R. Howard
                                       Sarah Riley Howard
                                       Business Address:
                                       146 Monroe Center, N.W., Suite 805
                                       Grand Rapids, MI 49503
                                       (616) 451-8496
                                       showard@psfklaw.com